In re EPCO NEWPORT NEWS ASSOCI-ATES, a limited partnership, Debtor.

EASTERN SAVINGS BANK, Plaintiff,

v.

EPCO NEWPORT NEWS ASSOCIATES, Defendant.

Bankruptcy No. 79 B 551 (EJR).

United States Bankruptcy Court, S. D. New York.

Nov. 6, 1981.

Finley, Kumble, Wagner, Heine, Underberg & Casey, New York City, for plaintiff Eastern Sav. Bank.

Anderson, Russell, Kill & Olick, P. C., New York City, for defendant Epco Newport News Associates.

EDWARD J. RYAN, Bankruptcy Judge.

On March 29, 1979, Epco Newport News Associates ("Epco"), a limited partnership organized and existing under the laws of the State of Virginia, filed a Chapter XII petition in the United States District Court for the Southern District of New York (the "New York Chapter XII case") pursuant to the provisions of the Bankruptcy Act. On the same date, Epco obtained an order of this court authorizing Epco's continued possession, operation and management of its property and staying and enjoining all proceedings or attempts to foreclose liens in accordance with Rule 12–43(a) of the Rules of Bankruptcy Procedure.

Eastern Savings Bank ("Eastern") is a savings bank organized, existing and operating under the laws of the State of New York. Eastern is Epco's sole secured creditor and owner and holder of a "Deed of Trust", "Deed of Trust Note" and "Assign-

ment of Lease", all dated September 5, 1973. The aforementioned documents executed by Epco and others, transferred, as security, Epco's leasehold estate in and to certain real property located in Newport News, Virginia, to "Trustees" therein named for the benefit of Eastern and its predecessor in interest, the Virginia National Bank.

Epco, at the time of the filing of its Chapter XII petition in this court, was engaged in the business of owning and operating what formerly was known as the Robert Hall Village Shopping Center in Newport News, Virginia (the "Shopping Center"). The buildings and improvements comprising the Shopping Center were owned by Epco subject to Eastern's rights as mortgagee. In order to finance the cost of constructing the Shopping Center, Epco had co-executed a Deed of Trust Note in the principal amount of $3,200,000, secured by the Deed of Trust and the Assignment of Lease. In accordance with the terms and conditions thereof, and the authority of the Bankruptcy Court, Eastern has foreclosed on the Deed of Trust.

Early in the 1970's, Epco entered into a sublease (the "Sublease") with Robert Hall Clothing ("Robert Hall"), as subtenant, covering most of the land and all of the buildings comprising the Shopping Center. The Sublease was guaranteed by Robert Hall's parent, United Merchants and Manufacturers ("UM&M").

In July, 1977, UM&M and its Robert Hall and other subsidiaries filed their respective Chapter XI petitions in the United States District Court for the Southern District of New York. During the course of those proceedings, the Sublease between Epco and Robert Hall of Robert Hall's retail outlet in the Shopping Center was rejected and disaffirmed by Robert Hall and UM&M pursuant to Section 313(1) of the Bankruptcy Act. In consequence of the rejection and disaffirmance, the retail outlet was closed. At the time of the disaffirmance of the Sublease, Robert Hall was in arrears on its rental obligations to Epco.

Thereafter, and on August 11, 1978, Epco filed a Chapter XII petition in the United States District Court for the Eastern District of Virginia (the "Virginia Chapter XII case"). In the course of that case, Epco secured approval of the Virginia Chapter XII court to settle its $929,000 rent claim against UM&M and/or Robert Hall (the "UM&M Claim") for $450,000. The order authorizing Epco to settle the UM&M Claim was entered on November 14, 1978, in the Virginia Chapter XII case.

UM&M paid Epco $194,425 during the course of the Virginia Chapter XII case, which sum constituted the full payment of that portion of Epco's $23,425 claim for use and occupation and 38% of its rental claim of $450,000 ($171,000), in accordance with UM&M's confirmed Chapter XI arrangement and the order authorizing the settlement of the UM&M Claim. The $171,000 payment was the first installment under the terms of the arrangement and settlement. On February 29, 1980, an additional installment (the "Installment") of $14,413 was made by UM&M to Epco. Eastern claims that it is entitled to a turnover of the Installment and the proceeds of the settlement of the UM&M Claim as well as any and all future distributions to be made by UM&M pursuant thereto.

The $194,425 received by Epco from the settlement of the UM&M Claim (the "Settlement Proceeds") was combined with certain other funds held by Epco which were derived from the rents received from another of Epco's subtenants, Farm Fresh Supermarkets ("Farm Fresh") which occupy a portion of the Shopping Center, and the aggregate thereof was used to purchase a $200,000 certificate of deposit (the "Certificate of Deposit") on January 11, 1979. (The proceeds of the Certificate of Deposit were reinvested from time to time thereafter prior to and during the New York Chapter XII case.)

On January 12, 1979, subsequent to the settlement of the UM&M Claim, Epco voluntarily dismissed its Virginia Chapter XII case without prejudice. Eastern did not appear in opposition to the dismissal al-

though it had notice thereof, nor did it, during the Virginia Chapter XII case, institute any adversary proceedings concerning the Settlement Proceeds.

Subsequent to the dismissal of the Virginia Chapter XII case and prior to the filing of the New York Chapter XII case, Eastern, as a result of defaults by Epco of its obligations under the Deed of Trust and Deed of Trust Note, commenced foreclosure proceedings against Epco. A judgment of foreclosure was obtained but the foreclosure sale scheduled for March 30, 1979, was automatically stayed on March 29, 1979, by virtue of Epco's filing the petition which commenced the New York Chapter XII case.

At the time when Epco commenced the New York Chapter XII case, it owed Eastern an aggregate of approximately $3,464,-000, of which $3,146,000 was on account of unpaid principal and $318,000 of which was interest due under the Deed of Trust and Note.

On May 2, 1979, Eastern, as Epco's sole secured creditor, commenced the within adversary proceeding by service of a complaint (the "Complaint") seeking (a) vacatur of the order authorizing Epco to operate its business as a debtor in possession; (b) dismissal of the New York Chapter XII case or the adjudication of Epco as a bankrupt; (c) vacatur of the automatic stay in effect to the extent necessary to permit Eastern to proceed to complete the foreclosure and foreclosure sale of the Shopping Center; (d) the impression of a constructive trust on all funds in Epco's possession including all rents, issues, profits, revenues, royalties, rights and benefits of the realty and the Settlement Proceeds including any future distributions to be made in accordance with the settlement of the UM&M Claim (hereinafter collectively referred to as the "Funds"); (e) the turnover to Eastern of the Funds; and (f) a determination of reasonable attorneys' fees and expenses to which Eastern was entitled under the Deed of Trust and Deed of Trust Note.

On May 16, 1979, a pretrial conference on the adversary proceeding commenced by Eastern's Complaint was held. At that time, Eastern submitted to the court a proposed order to show cause why a preliminary injunction and a temporary restraining order should not be granted prohibiting Epco from dissipating the Funds except to pay delinquent prepetition real estate taxes and current postpetition real estate taxes constituting a lien superior to Eastern's on the property. (Epco obtained the court's authorization, with Eastern's concurrence, to pay these taxes which amounted to $67,-247.64, out of the Funds which were invested in a certificate of deposit.) Eastern's application for a preliminary injunction was scheduled for a subsequent hearing.

At the May 16 hearing, the court suggested, *sua sponte*, that a dismissal of the New York Chapter XII case might be appropriate and asked Eastern's counsel whether Eastern would ever consent to any Chapter XII plan, including one pursuant to which Epco would pay Eastern 100 cents on a dollar. Eastern's counsel advised the court that Eastern would not consent to any plan; whereupon the court invited Eastern to move for an order dismissing the Chapter XII case on the ground that, as a sole secured creditor, Eastern was entitled to reject any proposed Chapter XII plan, even one which proposed to satisfy its claim or obligation in full. Eastern so moved. The court indicated that it was prepared to dismiss the case in view of Eastern's opposition to any possible Chapter XII plan which might be filed, and thereafter adjourned the hearing for one week in order to allow Epco to consider its position.

On May 25, 1979, Eastern's motion for a preliminary injunction and its adjourned oral motion to dismiss the Chapter XII case was heard. At the court's request, and over Epco's objection, Eastern's counsel again advised the court that Eastern would not accept any proposed Chapter XII plan. The court then granted Eastern's oral motion to dismiss.

Epco timely made application for an order staying the court's order of dismissal pending Epco's appeal to the United States District Court, which application was de-

nied after a full and complete hearing held on August 7, 1979. The court's findings of fact and conclusions of law concerning both its dismissal of the Chapter XII case and its denial of a stay thereof was entered on September 5, 1979. No appeal ever was filed from the order of dismissal.

The court in its conclusions of law held, *inter alia*, that "[w]here dismissal of a Chapter XII petition is ordered by the Bankruptcy Court, the Court has jurisdiction to deal with those funds in the Debtor's possession at the time of dismissal." The court ordered that "[n]otwithstanding the aforesaid dismissal, the Court retains jurisdiction over the Debtor and the funds which are the subject of Eastern's Second Cause of Action in the within Adversary Proceedings for the sole and limited purpose of determining the rightful ownership of the funds and other assets."

During the course of the New York Chapter XII case, Epco made no payments to Eastern with respect to its obligations under the Deed of Trust and Note on account of principal or interest due thereunder.

On May 2, 1979, Epco had in its possession or under its control aggregate funds which approximated $239,992. On September 5, 1979, Epco had in its possession or under its control funds approximating $170,221. Between May 2, 1979 and September 5, 1979, the only sums expended by Epco were for real estate taxes, security for and maintenance of the Shopping Center plus miscellaneous expenses, all of which expenditures totaled $74,404.88, of which $67,247.64 was attributable to the payment of real estate taxes.

On October 10, 1979, Epco's property was sold at a public foreclosure sale. Eastern was the sole bidder and it bid-in the property. The net proceeds of the sale, after payment of the expenses of sale, was $3,176,232.49.

At the time the foreclosure sale was held, Eastern was owed approximately $3,629,-627.90, of which $3,146,000 represented unpaid principal, $467,929.54 of which represented accrued and unpaid interest, plus $15,605.46 costs and expenses incurred by Eastern under the terms of the Deed of Trust and Deed of Trust Note. Eastern has suffered a deficiency of $503,395.41.[1]

As of October 1, 1980, Epco had in its possession funds aggregating $211,317, including the Installment of $14,413 received by Epco from UM&M on February 29, 1980, of which $180,018 is invested in a certificate of deposit issued by the Virginia National Bank, plus the sum of $31,299 which is in a demand account maintained by Epco at the Virginia National Bank. Epco presently has no other funds, and its only other property is its right to receive further distributions on account of the UM&M Claim. The Funds currently in Epco's possession are derived from the settlement proceeds and rents previously received from Farm Fresh, plus interest earned thereon.

Eastern contends that this court has jurisdiction over the controversy and the Funds in order to completely determine Eastern's rights to the Installment and any future distributions in accordance with the terms of the UM&M Settlement and UM&M's Chapter XI plan. Epco disputes this contention and believes that this court's jurisdiction is limited to determining Eastern's entitlement to only those cash funds in Epco's possession at the time the New York Chapter XII case was dismissed. Furthermore, Epco asserts that under the terms of the Assignment of Lease, Eastern was required to make demand upon it for the turnover of the Funds, that no demand was made upon it and, consequently, that Eastern is not entitled to the Funds. East-

---

1. Contrary to Epco's assertions, the deficiency suffered by Eastern at the foreclosure sale does not constitute the entry of a "deficiency or other personal money judgment" such as is prohibited under the provisions of the Note. Eastern is merely attempting to recoup the losses suffered as a result of the foreclosure and Epco's default under the Deed and Note.

The proceeds of the UM&M Settlement which Eastern is seeking as part of the settlement of its claim against Epco derives from property to which Eastern, as secured creditor, can turn. Accordingly, there is no merit to Epco's claim that the funds and assets being sought by Eastern represent a deficiency judgment to which Eastern is not entitled.

ern's position is that no demand had to be made upon Epco as a condition precedent to and in order for Eastern to be entitled to the Funds or for Epco to be liable therefor.

■ Contrary to Epco's assertions, this court does have jurisdiction to determine Eastern's entitlement to the entire Fund, not just those cash funds in Epco's possession at the time that the New York Chapter XII case was dismissed.[2]

The dismissal order dated September 5, 1979, *inter alia*, specifically carved out jurisdiction "[o]ver the Debtor and the funds which are the subject of Eastern's Second Cause of Action in the within Adversary Proceedings for the sole and limited purpose of determining the rightful ownership of the funds and other assets."

The funds which were the subject of Eastern's Second Cause of Action in the adversary proceeding to which the September 5th order refers, are those same funds which are presently before this court.

Epco relies on *In re Stillbar Construction Co.*, 4 Bankr.Ct.Dec. 1110 (N.D.Ga.1978) as authority for its position that, despite a court order explicitly to the contrary, this court lacks jurisdiction over the Funds. In *Stillbar*, the court was without jurisdiction over future rents accruing to the debtor after dismissal of a Chapter XII proceeding, although in its order of dismissal the court retained jurisdiction to dispose of funds then in the debtor's hands.[3] Epco attempts to characterize the proceeds of the UM&M receivable as future rents which, under the authority of *Stillbar*, are not within the dismissing court's jurisdiction.

However, contrary to the situation in *Stillbar*, the UM&M receivable does not constitute future rents, but rather a chose in action consisting of the settlement of a debt owed by a third party to Epco, which accrued prior to the commencement of this case.

■ The debt here at issue came into existence as a result of UM&M's rejection and disaffirmance of its sublease with Epco. It is well settled that rejection or breach of a lease gives rise to a claim for damages and not for future rents. See, Bankruptcy Act, Section 63(a), 11 U.S.C. § 103(a). Similarly, under the law of the State of Virginia, the situs of the leased property, breach of a lease gives rise to a damages claim. "[T]he [lessor] is not entitled to recover for rent of the premises, but he has compensation for the injury sustained in consequence of the breach of the contract . . . ." *James v. Kibler's Adm'r.*, 94 Va. 165, 26 S.E. 417 (1896).

UM&M rejected its lease with Epco and thereby became liable to Epco for damages. The settlement of the damages claim, although paid out over time in installments pursuant to UM&M's Plan of Reorganization, does not constitute actual future rental payments. The UM&M receivable, for jurisdictional purposes, may properly be characterized as a presently existing chose in action that came into being prior to dismissal of Epco's New York Chapter XII case and, therefore, is part of a Fund subject to this court's jurisdiction.

Eastern contends that, pursuant to the Deed of Trust ("Deed"), Deed of Trust Note ("Note"), and Assignment of Lease ("Assignment"), Epco's default on any of its obligations thereunder automatically vested Eastern with an absolute right to the rents and profits of the property secured by said instruments. Epco, however, interprets the instruments as requiring Eastern to make demand as a condition precedent to its right to collect rent from Epco's tenants. Epco argues that the Assignment was intended merely as additional security and that Epco had the right to continue to collect and retain rents until a demand for them was made by Eastern.

---

**2.** There is no dispute between the parties that this court has jurisdiction to determine the distribution of cash funds in the debtor's possession at the time of dismissal of its Chapter XII case. *See, In re Tinkoff*, 156 F.2d 405 (7th Cir. 1946), *cert. denied*, 330 U.S. 820 (1947).

**3.** Cf. *In re Oceana International, Inc.*, 376 F.Supp. 956 (S.D.N.Y.1974), where bankruptcy court jurisdiction is severely limited post-confirmation, regardless of language in the confirmation order which attempts to retain jurisdiction.

The issue which is central to a determination of entitlement to the Fund is whether the Assignment from Epco to Eastern was absolute with no conditions precedent or, whether the Assignment was intended merely as additional security for Epco's mortgage indebtedness.

Eastern asserts an absolute right to the Funds in Epco's possession based upon principles of equity as well as Epco's defaults under the mortgage instruments. That portion of the assignment under which Eastern asserts its rights and which language Epco contests as a mischaracterization by Eastern, recites in part:

"Assignor [Epco] does hereby authorize and empower Assignee [Eastern] to collect said rents, issues, profits, revenues, royalties, rights and benefits (hereinafter collectively, 'rents') as they shall become due, and does hereby direct each and all of the tenants of the Property to pay such rents, as may now be due or shall hereafter become due, to Assignee *upon demand for payment thereof by Assignee. It is understood and agreed, however, that no such demand shall be made unless and until there has been a default* in the payment of the Note hereinafter mentioned, or any installment thereof, or any interest thereon, or a default in the performance of, or compliance with, any of the covenants, conditions and agreements set forth in the Deed of Trust hereinafter mentioned securing the Note, and *until such demand is made, Assignor is authorized to collect or continue collecting said rents . . .*" (Emphasis added).

Epco contends that Eastern had to make demand upon the former [4] before Eastern would be entitled to payment of the rents. Eastern, however, asserts that it was immediately vested with a right to rents, profits, revenues, et al., upon Epco's default, and that any such monies collected by Epco after default and before demand by Eastern were held in trust for the latter's benefit.

In *Butner v. United States,* 440 U.S. 48 (1979), the Supreme Court held that the issue of entitlement to rents and profits of mortgaged property was one to be determined by applicable State law. Since Epco's property is located in Virginia, entitlement to rents must be determined by reference to the laws of that State.

There is a divergence of opinion among the states regarding entitlement to rents of mortgaged property. The majority of states adhere to the "lien theory," whereby title to mortgaged property remains in the mortgagor and conveys to the mortgagee only a lienholders' interest. The mortgagee must take some affirmative action in order to effectuate entitlement to rents. The minority of states, of which Virginia is one, subscribes to the "title theory," under which "(A) mortgage convey[s] to the mortgagee legal title defeasible upon complete fulfillment of the secured obligation." *Mortgagee's Right to Rents after Default,* 50 Yale L.Rev. at 1425, n. 3. In a "title state," upon the mortgagor's default "the mortgagee is automatically entitled to possession of the property and to a secured interest in the rents." *Butner v. United States, supra* at 52.

Language substantially similar to that used in the Deed and Assignment now before this court has already been analyzed by the Court of Appeals for the Fourth Circuit. In *Fidelity Bankers Life Insurance Company v. Williams ("Fidelity"),* 506 F.2d 1242 (4th Cir. 1974), the court held that where a mortgagor executed both a deed of trust and a supplemental assignment of rents, the mortgagee had an absolute right to possession of the encumbered property as well as to rents, issues and profits immediately upon default by the mortgagor. In accordance with the provisions of the Deed and Assignment, the mortgagee was not required to take any affirmative steps to perfect his claim for rents.

Misconstruing the language used in the Deed and Assignment, both in *Fidelity* and the instant case, Epco has repeatedly insist-

---

4. In a letter to the court, dated June 19, 1981, Epco retreated from this position and asserted that demand need only have been made upon the subtenants.

ed that Eastern had to take affirmative steps, in the form of a demand for rents, as a condition precedent to its entitlement, if any, to the rents from the secured property. Such demand, argues Epco, was not made until institution of this proceeding, thereby entitling Eastern only to those funds accruing subsequent to the filing by Epco of its New York Chapter XII petition.

To support its position, Epco relies on the dictum in *In re 1616 Reminc Limited Partnership*, 8 CBC 718 (E.D.Va.1976). However, the issue before that court was whether there was jurisdiction over the debtor's property. Necessary to a determination of the jurisdictional issue was whether a separate assignment of rents was an unconditional conveyance or whether it merely constituted a security interest for a deed of trust note. The *Reminc* court held that the assignment was not absolute since it was ultimately subject to the retirement of the indebtedness and that the debtor, therefore, retained an equitable interest in rents. This equitable interest brought the mortgage interest within the jurisdiction of the Virginia court and so, for jurisdictional purposes, the assignment was viewed as a security interest and not an absolute conveyance.

In the instant case, however, there is no question as to the court's jurisdiction over the debtor and its property. The reliance by Epco on *Reminc* for other than jurisdictional purposes, is misplaced. The court's holding in *Reminc* is not dispositive of the issue of the effect of an assignment of rents on the rights of the respective parties. In any event, the dicta in *Reminc* are contrary to the Fourth Circuit's decision in *Fidelity*, which decision is controlling in this case.

█ In addition, the equities of the case demand that the funds and other assets in Epco's possession be turned over to Eastern. Even in a "lien state," where demand for rents is a condition precedent to a mortgagee's rights thereto, the courts have held, "[T]o hold that mortgagees had a legal right to those rents . . . but [are] precluded because they did not demand, overlooks that the property was before a court of equity and equitable remedies commensurate with it are available." *Mortgage Loan Co. v. Livingston*, 45 F.2d 28, 34 (8th Cir. 1930). In the instant case, there was no requirement that Eastern take any affirmative action to perfect its absolute rights to rents and profits from Epco's property after default by Epco. Therefore, the fact that Eastern failed to make demand does not prevent this court of equity from determining the mortgagee's legal right to the rents. Conversely, equitable considerations concerning general creditors' rights to the funds in the debtor's possession are not relevant here since the mortgagee asserting the right to Epco's funds is Epco's only creditor and, therefore, the only one entitled to the funds in the debtor's possession.

Thus, the fact that Eastern did not make demand on either Epco or the subtenants, does not divest Eastern of its entitlement to the rents or funds collected as damages in lieu thereof. Eastern's failure to make demand after Epco's default merely precluded Eastern from collecting rents directly from the subtenants. However, the absence of demand did not constitute a forfeiture of Eastern's entitlement to the rental proceeds from the date of Epco's default.

Although Epco settled with its tenants, Epco remains liable as of the date of its default, for any and all funds collected from its tenants on account of their rental obligations. Thus, any rental claim or damage claim constitutes settlement proceeds funds due on account of an underlying rental obligation and, as such, are funds to which Eastern is entitled.

This court, as a court of equity, and consistent with the language of the Deed and Assignment, imposes a constructive trust on any and all funds collected by Epco, since the time of its default, on account of its tenants' rental obligations. Accordingly, Eastern is entitled to all of the Funds currently in Epco's possession, as well as any future installments made by UM&M to Epco in accordance with their settlement agreement.

Settle an appropriate order.