**In re WESTCHASE I ASSOCIATES, L.P., A Delaware Limited Partnership, Debtor.**

**Bankruptcy No. C–B–89–31225.**

United States Bankruptcy Court, W.D. North Carolina, Charlotte Division.

Feb. 21, 1990.

J. William Porter, Steven R. Hunting, Parker, Poe, Thomspson, Bernstein, Gage & Preston, Charlotte, N.C., for debtor.

Travis W. Moon, Karen S. Williams, Rayburn, Moon, and Smith, P.A., Charlotte, N.C., for Lincoln Nat.

ORDER DENYING LINCOLN NATIONAL LIFE INSURANCE COMPANY'S MOTION FOR RELIEF FROM STAY, MOTION FOR ORDER PROHIBITING USE OF CASH COLLATERAL, MOTION FOR APPOINTMENT OF RECEIVER AND MOTION FOR ORDER DIRECTING SEQUESTRATION OF RENTS/PROFITS AND INSURANCE PROCEEDS

MARVIN R. WOOTEN, Bankruptcy Judge.

This matter came before the court on November 15, 1989, and after the hearing on that date, a temporary Order was entered and the matter was continued to December 12, 1989, for further hearing on the above titled Motions of Lincoln National Life Insurance Company. At the December 12 hearing, the court allowed into evidence a written appraisal on the value of the property in question offered by counsel for Westchase during the hearing, with counsel for Lincoln National having no prior opportunity to examine that document. Due to this lack of opportunity to examine the document, at the close of the evidence the court took the matter under advisement and allowed Lincoln National a period of time within which to examine the appraisal and an opportunity to object thereto.

A timely objection to the appraisal was subsequently filed, and on February 16, 1990, the court heard further evidence concerning the value of the property in question and the validity of the previously submitted appraisal report. At the February 16 hearing, both appraisers who had previously testified for Lincoln and Westchase at the December 12 hearing, respectively, further testified in support of their positions. An additional expert witness, Robert Martin, testified for Westchase. Mr. Martin was employed by Westchase to examine the appraisals of the two witnesses, one offered by Westchase and one by Lincoln, and to evaluate each appraisal. Mr. Martin was not hired to do an additional appraisal. At the hearing, Martin testified that he agreed with some positions taken by each witness's appraisal, and disagreed with others. The witness testified, however, that he found both appraisals to be reasonable and within due bounds of the standards of acceptability within the profession.

After a careful consideration of the evidence and the arguments of the parties presented on all hearing dates concerning all issues, and of the law as applied to the record in this case, the court finds as follows:

FINDINGS OF FACT

1. Westchase I Associates, L.P., is a Delaware limited partnership which owns a commercial office building located at 4421 Stuart Andrew Boulevard in Charlotte, North Carolina. The Debtor's sole general partner is EGF Charlotte Partners, LP, a Delaware limited partnership. The only general partners of EGF Charlotte are George Post and David Goldstein.

2. On October 2, 1986, the Debtor purchased the Building from Interstate 77 Partnership No. 1. At the closing, the Debtor paid Interstate approximately $2,800,000.00 plus certain other consideration. The Debtor acquired title to the building subject to a Deed of Trust and Security Agreement which, together with additional collateral loan documents including an Assignment of Rents and Profits and a Blanket Assignment of Leases, secured a promissory note from Interstate to

Lincoln National Pension Insurance Company dated June 23, 1986, in the original principal amount of $10,200,000.00.

3. On January 25, 1985, prior to the Debtor's acquisition of the Property, J.D. Simms & Company, the general partner of Interstate, and Bojangles of Tennessee, Inc., a Tennessee corporation now known as Bojangles Corporation, entered into a lease agreement pursuant to which Bojangles leased from J.D. Simms & Company approximately 51,371 square feet of rentable area on the first, fourth and fifth floors of the building (the Bojangles premises).

4. The building has approximately 112,000 square feet of rentable space. Bojangles, renting approximately 46% of that rentable space, was the Debtor's major tenant in the building.

5. In or about late 1987, Bojangles defaulted on its rental obligations to the Debtor pursuant to the Lease Agreement by making late or partial rental payments. Despite these defaults by Bojangles, which persisted through September, 1988, the Debtor continued to make its monthly mortgage payments to Lincoln in a timely manner. The Debtor immediately notified Lincoln of the Bojangles default problem.

6. In October, 1988, Bojangles again failed to make its monthly rental payment, and at this point the Debtor was unable to make its mortgage payment to Lincoln for October.

7. After unsuccessful demands for the payments from Bojangles, the Debtor, on November 4, 1988, instituted an action in state court seeking a judgment against Bojangles for possession of the Bojangles Premises and for past due and accelerated future rental payments.

8. Due to continued failure of Bojangles to make rental payments to the Debtor, the Debtor was unable to make its monthly mortgage payments to Lincoln for November and December, 1988, and for January, 1989.

9. On or about January 6, 1989, Lincoln notified the Debtor that its failure to make its mortgage payments from October, 1988, through January 6, 1989, constituted an event of default as defined by the provisions of the Note and Deed of Trust and requested that the Debtor pay the past due amount together with late charges within 10 days.

10. On or about January 23, 1989, Lincoln notified the Debtor that it was exercising its right under the Note and Deed of Trust to declare the entire unpaid balance of the principal and accrued interest due under the Note to be payable immediately.

11. On January 24, 1989, Lincoln filed foreclosure proceedings in state court. A hearing on the foreclosure of the Deed of Trust was set for March 10, 1989. Lincoln also petitioned the state court for the appointment of a receiver of the building and the rents and profits derived therefrom.

12. On January 25, 1989, the Debtor and Bojangles executed a settlement agreement in the Bojangles action. The settlement agreement provided for modification of the lease agreement, along with a surrender payment of $900,000.00.

13. This settlement agreement was expressly conditioned upon Lincoln's consent.

14. On or about January 30, 1989, Lincoln's petition for appointment of receiver was heard, and that petition was denied.

15. Lincoln again sought to have a receiver appointed for the building, rents and profits, and that renewed petition was again denied on February 17, 1989.

16. Although, the Superior Court found that there were not sufficient grounds for the appointment of a receiver, the court did suggest, pursuant to the request of counsel for the Debtor and the consent of counsel for Lincoln, that the parties reach an agreement regarding the settlement funds.

17. The parties agreed to place the settlement funds, representing rent arrearages, in a segregated bank account on terms to be agreed upon by the Debtor and Lincoln, pending resolution of the foreclosure proceeding, and those funds were subsequently placed in an account maintained by Debtor's counsel.

18. On March 10, 1989, prior to the hearing on the foreclosure of the Deed of Trust, the Debtor instituted an action in

the Mecklenburg County Superior Court, seeking, among other things, preliminary and permanent injunctions restraining and enjoining the foreclosure sale of the building.

19. On March 13, 1989, an Order for Foreclosure was entered and filed, and on March 14, 1989, the foreclosure sale of the building was noticed for April 5, 1989.

20. By letter dated March 30, 1989, Lincoln consented to the settlement agreement conditioned upon the Debtor's agreement to disburse the proceeds of the settlement either directly to Lincoln or into a segregated account to be disbursed in accordance with terms to be determined by the Debtor and Lincoln.

21. By letter agreement dated March 31, 1989, the Debtor and Lincoln agreed that the foreclosure proceeding would be dismissed with prejudice and that the Debtor's lawsuit seeking to enjoin foreclosure would also be dismissed; that the proceeds of the settlement agreement, with the exception of rent to be paid by Bojangles under its modified lease, would be placed in a segregated account; that Lincoln was to be brought current; that the parties would attempt to negotiate a resolution of their dispute concerning the disbursement of, and other issues relating to, the settlement proceeds.

22. On April 10, 1989, the above actions were in fact dismissed.

23. Pursuant to the agreement, the Debtor paid Lincoln the sum of $595,000.00 on April 11, 1989, to bring the Debtor current on its mortgage obligation to Lincoln through March 31, 1989.

24. Bojangles made all of its scheduled surrender and installment payments required under the settlement agreement.

25. On September 8, 1989, Lincoln notified the Debtor that its failure to make the August and September debt service payments constituted an event of default as defined by the provisions of the Note and Deed of Trust, and notified the Debtor of Lincoln's intent to pursue legal action to enforce its rights if the Debtor failed to pay $170,000.00 from funds other than the segregated Bojangles settlement proceeds within 10 days from the date of the letter.

26. On September 19, 1989, Lincoln filed a Notice of Hearing on Foreclosure Deed of Trust in state court, and also filed a Petition for Appointment of Receiver.

27. On September 22, 1989, the building was allegedly damaged by hurricane Hugo, for which damage the Debtor may be entitled to collect insurance proceeds.

28. On October 6, 1989, the Debtor filed its bankruptcy petition under Chapter 11.

29. Since the filing of the Chapter 11, the Debtor has remained in possession of the property and operated and managed the business and has taken reasonable steps to maintain the condition of the building, including efforts to lease the remaining space in the building.

30. When the Debtor filed its Chapter 11 petition, the outstanding amount owed to Lincoln by the Debtor was approximately $10,677,500.00.

31. When the Debtor filed its Chapter 11 petition, the building in which Lincoln is secured for the above amount had a value of approximately $10,850,000.00, with an excellent possibility for improvement of this value within a reasonable period of time to the figure of approximately $13,000,000.00.

32. This is a single asset case, the business of the Debtor being the management and leasing of the building in which Lincoln holds a security interest.

## DISCUSSIONS AND CONCLUSIONS OF LAW

I. Motion for Relief from Stay

■ Lincoln National's claim, at the date of the bankruptcy petition, totalled $10,667,500.00. As stated above, the court finds that a reasonable value of the building upon which Lincoln seeks relief from stay, valued as of the date of the filing of the bankruptcy petition, is $10,850,000.00. Due to these facts, the court concludes that Lincoln is fully secured and in fact, is slightly over secured. In *In re United Savings Association of Texas v. Timbers*

*of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988), the Supreme Court stated that a secured creditor is entitled to adequate protection of the value of its collateral on the petition date. *Id.* at 377, 108 S.Ct. at 633. One protection for the secured creditor is found in § 362(d)(2), which provides that a secured creditor is entitled to relief from the automatic stay if: (1) the Debtor does not have equity in the collateral, and (2) the collateral is not necessary to an effective reorganization. *Id.* at 375, 108 S.Ct. at 632.

As stated above, the Debtor does have some equity in this collateral and therefore the Debtor has met its burden under the first requirement. As to the second requirement, the *Timbers* court elaborated on the weight of the burden that the Debtor must bear. The court stated that, the Debtor must show not only that the property is necessary, but also that there is a reasonable possibility of a successful reorganization within a reasonable time. The court also affirmed the opinion of the lower court that, during the four-month exclusive period of § 1121(b), the Debtor is required to make a much less detailed showing that an effective reorganization is possible than is required at the plan confirmation stage. *Id.* at 375–76, 108 S.Ct. at 632–33. The Debtor must make a showing to the court that it has a reasonable possibility of a successful reorganization within a reasonable period of time. *Id.* Lincoln is over secured, the building is appreciating slightly, and, due to the nature of the business of the Debtor, this building is essential to that Debtor's reorganization. In fact, without the building, there will be no reorganization. The Debtor has met its burden of showing that it has a reasonable possibility of reorganization within a reasonable period of time. Since the Debtor has met its burdens necessary to defeat Lincoln's motion, relief from stay under 11 U.S.C. § 362 is not warranted at this time.

■ In due course, Lincoln may be entitled to recover benefits under § 506(b). Due, however, to the ever present possibility that appreciation of the property to an estimated value of $13,000,000.00 may not be realized within a reasonable time, along with the current minimal equity of the Debtor, the court concludes that the Debtor should commence making interest payments to Lincoln beginning on March 1, 1990. Additionally, the Debtor shall tender to Lincoln interest payments due on the debt for the months of January and February, 1990, representing the periods of time in which decision on this matter was pending. The court affords Lincoln this protection due to the narrow equity cushion that exists in this case.

As stated herein, Lincoln holds no interest in the rents and profits of the Debtor, and therefore, further discussion on the issues of relief from stay or adequate protection for Lincoln in those rents is moot.

## II. Motion for Appointment of Receiver and For Order Directing Sequestration of Rents/Profits and Insurance Proceeds

### A. Sequestration of and Appointment of a Receiver for Rents and Profits

■ Lincoln seeks the appointment of a receiver for and the sequestration of the rents and profits of the Debtor, to render effective the clauses in the security instruments executed by Lincoln and the Debtor concerning Lincoln's purported interest in those rents and profits.

Section 362 of the Bankruptcy Code, provides a stay against actions to "create, perfect, or enforce" a lien on property of the estate. This section prohibits this attempt by Lincoln of post-petition perfection and enforcement of the lien that Lincoln claims in these rents and profits. Lincoln's attempts to procure the appointment of a receiver or the sequestration of those funds are merely an attempt to perfect its security interest post-petition, and are therefore prohibited by § 362. In addition, § 105(b) of the Bankruptcy Code prohibits the appointment of a receiver by the Bankruptcy court.

Section 362(b) does not operate to stay actions to perfect a security interest post-petition under circumstances delineated in

§ 546(b). That section allows post-petition perfection under

> any generally applicable law that permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of such perfection. If such law requires seizure of such property or commencement of an action to accomplish such perfection, and such property has not been seized or such action has not been commenced before the date of the filing of the petition, such interest in such property shall be perfected by notice within the time fixed by such law for such seizure or commencement.

11 U.S.C. § 546(b).

The House and Senate Reports concerning § 546(b) state that this exception was designed to accommodate such situations as those involving holders of a purchase-money security interest, which, due to the intervention of bankruptcy, were prohibited from perfecting their liens. Under state law, such holders would have been allowed to perfect their interest within a certain period of time with such perfection relating back to the date of the security agreement. The House and Senate Reports clearly state that this provision is not designed to create new rights, but is only designed

> to protect, in spite of the surprise intervention of bankruptcy petition, those whom State law protects by allowing them to perfect their liens or interest as of an effective date that is earlier than the date of perfection.

S.Rep. No. 989, 95th Cong., 2d Sess. 86 (1978), U.S.Code Cong. & Admin.News 1978, p. 5872; H.Rep. No. 595, 95th Cong., 1st Sess. 371 (1977), U.S.Code Cong. & Admin.News 1978, p. 6327. Section 546(b) contemplates the above situation or

> a situation such as a mechanic's and materialman's lien ... where the perfection has a retroactive effect and cuts off intervening parties.

Eldridge, "Mortgagee's Right to Rents Post–Petition in Lien–Theory States: The Effect of a Rent Assignment–Wonderland Revisited," *Norton Bankruptcy Law Adviser*, No. 11, p. 4 (November 1989).

While some courts have interpreted § 546(b) as allowing post-petition perfection of an interest in rents and profits, this court concludes that the better rule of law is that post-petition perfection is prohibited by § 362 unless applicable law allows the rights put in place by perfection to relate back to an earlier date, effecting priority over intervening parties. *See, In re Gotta,* 47 B.R. 198 (Bkrtcy.W.D.Wis.1985); *In re Harbour Town Associates, Ltd.,* 99 B.R. 823 (Bkrtcy.M.D.Tenn.1989); *In re Prichard Plaza Associates Ltd. Partnership,* 84 B.R. 289 (Bkrtcy D.C.Mass.1988); *In re Association Center Ltd. Partnership,* 87 B.R. 142 (Bkrtcy.W.D.Wash.1988); *In re Metro Square,* 93 B.R. 990 (Bkrtcy.D.C. Minn.1988); *In re Multi–Group III Ltd. Partnership,* 99 B.R. 5 (Bkrtcy.D.C.Ariz. 1989).

In *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979), the Supreme Court held that the effectiveness of a rent assignment is determined by state mortgage law. *Id.* at 57, 99 S.Ct. at 919. Although *Butner* was decided under the Bankruptcy Act of 1898, the courts have uniformly held that it is applicable to the Bankruptcy Code of 1978. *See, e.g., Saline State Bank v. Mahloch,* 834 F.2d 690, 692 (8th Cir.1987); *In re Camelot Associates Limited Partnership,* 102 B.R. 161, 164 (Bkrtcy.D.C.Minn.1989); *In re Prichard Plaza Associates Limited Partnership,* 84 B.R. 289, 293 (Bkrtcy.D.C.Mass. 1988). The applicable state mortgage law in this case would be North Carolina law, since the building is located in Charlotte, North Carolina. There are no provisions in the law of North Carolina, statutory or otherwise, which provide for the relation back of the perfection of rents and profits, and consequently, the exception to § 362 which is found in § 546(b) can not be utilized to allow Lincoln to perfect post-petition. Therefore, the court concludes that Lincoln's request for the appointment of a receiver and sequestration should be denied.

### B. Insurance Proceeds

On the record before the court, it appears that the Debtor may be entitled to

insurance proceeds stemming from hurricane damage. The court does not find that sequestration of or the appointment of a receiver for those proceeds is warranted, and instead instructs the Debtor to apply any such proceeds in accordance with the provisions set out herein.

III. Motion for Order Prohibiting Use of Cash Collateral

A. Does Lincoln National hold a perfected security interest in the rents and profits of the mortgaged property?

1. Perfection by Possession

■ Before the court can prohibit the use of cash collateral it must answer the threshold question of: What is Lincoln's interest in this so-called cash collateral? As stated above, the determination of a party's interest in rents and profits from land is a matter to be decided under state mortgage law. *Butner*, 440 U.S. at 57, 99 S.Ct. at 919. Therefore, the court must examine the state of the law in North Carolina relating to the right of a mortgagee to rents and profits realized from the mortgaged realty.

In examining the applicable law, the court will discuss the basis of Lincoln's assertion that they hold a perfected security interest in the rents and profits of the Debtor's building. Lincoln claims that, as in the cases of *In re Epco Newport News Association*, 14 B.R. 990 (Bkrtcy.S.D.N.Y. 1981) and *Fidelity Bankers Life Insurance Company v. Williams*, 506 F.2d 1242 (4th Cir.1974) (both applying Virginia law), the rent assignment between the Debtor and Lincoln is an absolute assignment, and requires no further steps by the mortgagee for that assignment to be perfected. This is contrasted with a conditional assignment, which must be perfected after the default of the mortgagor by way of the mortgagee taking affirmative steps, such as gaining possession or achieving the appointment of a receiver for the rents. Lincoln asserts that, like Virginia, in North Carolina an absolute assignment of rents becomes effective upon default of the mortgagor and no further steps are necessary to ensure

Lincoln's interest in these rents, so long as the agreement granting the security interest in the rents is properly recorded [as required in *First & Citizens National Bank v. Sawyer*, 218 N.C. 142, 10 S.E.2d 656 (1940)].

In *Epco*, the court gave a short discussion of property law. The court observed that

[t]here is a divergence of opinion among the states regarding entitlement to rents of mortgaged property. The majority of states adhere to the "lien theory," whereby title to mortgaged property remains in the mortgagor and conveys to the mortgagee only a lienholders' interest. The mortgagee must take some affirmative action in order to effectuate entitlement to rents. The minority of states, of which Virginia is one, subscribes to the "title theory," under which "(A) mortgage convey[s] to the mortgagee legal title defeasible upon complete fulfillment of the secured obligation." *Mortgagee's Right to Rents after Default*, 50 Yale L.Rev. at 1425, n. 3. In a "title state," upon the mortgagor's default the mortgagee is automatically entitled to possession of the property and to a secured interest in the rents.

*Epco* at 995. Therefore, *Epco*, applying the Virginia title theory, found that with an absolute assignment the mortgagee need not take any further steps to perfect his interest in rents after the mortgagor's default.

If North Carolina follows the same rules of possession regarding mortgaged property, then an absolute assignment of rents in North Carolina would have the same effect, and Lincoln would have a perfected security interest in these rents and profits.

North Carolina has been classified as a 'title' State, although it does not adhere to this theory in its purest form. Under its case law, a mortgagee is entitled to possession of the mortgaged property upon default, and need not await actual foreclosure. Such possession might be secured either with the consent of the mortgagor or by an action in ejectment.

But so long as the mortgagor does remain in possession, even after default, he—not the mortgagee—appears to be entitled to the rents and profits.

*Butner v. United States*, 440 U.S. 48, 52 n. 3, 99 S.Ct. 914, 916 n. 3, 59 L.Ed.2d 136 (1979) (citations omitted).

If the above statement found in the *Butner* case is valid, then the cases interpreting Virginia (pure title theory) law are not dispositive, as the mortgagee is not entitled to possession of the property immediately upon the default of the mortgagor in North Carolina, but the mortgagee must obtain possession of the property by consent or legal action. Lacking consent or success in such legal action, the mortgagor is entitled to the enjoyment of the rents and profits.

Upon a summary survey of the North Carolina cases, it appears that North Carolina courts have recognized some exceptions to the requirement that the mortgagee obtain possession in a manner as set out above. The first alleged exception originated in the case of *Credle v. Ayers*, 126 N.C. 11, 35 S.E. 128 (1900). That case states that:

> The defendant contends that he is not liable for mesne profits and relies upon *Killebrew v. Hines* [104 N.C. 268], *Carr v. Dail* [114 N.C. 284], and *Hinton v. Walston* [115 N.C. 7]. Those cases hold that a vendee or mortgagor, before or after breach, who is permitted to retain possession, is entitled to the rents and profits (unless there is an express stipulation in the contract or mortgage to the contrary, as in *Edgerton v. Crinkley*, 113 N.C. 444 [18 S.E. 669]; *Jones v. Jones*, 117 N.C. 25 [23 S.E. 214]).

*Id.* at 14–15, 35 S.E. 128 (citations omitted).

In both *Edgerton* and *Jones*, issues of landlord liens and the landlord/tenant relationship were involved. These exceptions noted in *Credle* have no application to the contractual agreements and the mortgagor/mortgagee relationship between Lincoln and the Debtor. *Killebrew v. Hines*, 104 N.C. 182, 10 S.E. 159 (1889), which was cited by the *Credle* court, held that

> even where the income is specially pledged as security for the mortgage

debt, with the right in the mortgagee to take possession upon the failure of the mortgagor to perform the conditions of the mortgage, the general rule is that the mortgagee is not entitled to the rents and profits of the mortgaged premises, until he takes actual possession, or until possession is taken in his behalf by a receiver. *Freedman's Saving Co. v. Shepherd*, 127 U.S. [494] 502 [8 S.Ct. 1250, 1254, 32 L.Ed. 163].

*Killebrew* at 191, 10 S.E. 159.

> [t]hese authorities, and many others, which we could cite, abundantly show that, until entry, the mortgagee is not entitled to rents.

*Id.*

Lincoln attempts to take the *Credle* phrase "unless there is an express stipulation to the contrary" and use it as authority to exclude an absolute assignment of rents from the possession rule. This court can find no valid authority in North Carolina which recognizes a distinction between an "absolute" assignment of rents and an assignment as "additional security."

Even if there were some North Carolina authority which recognized the distinction, the agreements between Lincoln and the Debtor do not grant possession of the rents and profits to Lincoln immediately upon default. The "stipulation to the contrary" in the agreements between Lincoln and the Debtor are as follows:

> Grantor [mortgagor] hereby absolutely, unconditionally and irrevocably grants, transfers, conveys and assigns to Beneficiary all the rents, issues and profits from the Premises and hereby gives to and confers upon Beneficiary [mortgagee] the right, power, and authority after a Default hereunder to collect such rents, issues and profits. Grantor irrevocably appoints Beneficiary its true and lawful attorney in fact, at the option of Beneficiary at any time and from time to time, after a Default hereunder to demand, receive and enforce payment, to give receipts, releases and satisfactions and to sue, in the name of Grantor or Beneficiary, for and otherwise collect all such rents, issues and profits and apply

the same to the indebtedness secured hereby; provided, however, that Grantor shall have the right to collect such rents, issues and profits, but not more than one (1) month in advance, except in the ordinary and prudent course of business, prior to or at any time there is not an event of default under any of the loan documents. The assignment of the rents, issues and profits from the premises in this Article ... is intended to be a present and absolute assignment from Grantor to Beneficiary and not merely the passing of a security interest. The rents, issues and profits are hereby assigned absolutely by the Grantor to Beneficiary.

Under this clause, the rents are purportedly absolutely assigned to the mortgagee with a license back to the mortgagor to collect those rents until an event of default occurs, at which time that license will be revoked. Other clauses in the agreements support this arrangement. Under the agreement, however, the mortgagee is not entitled to the rents immediately upon the mortgagor's default. The mortgagee must demand the possession of the rents, and pursuant to the agreement the mortgagor is given a period of time within which to cure the default. The documents also have provisions for the appointment of a receiver. Therefore, no matter what the mortgagee labels this assignment, absolute or conditional, its terms prove that it is not absolute on its face. The mortgagee, upon default, would be required to take additional steps to perfect its security interest in the rents, including allowing time for the mortgagor to cure after default and a demand for the rents and profits is made.

■ Additionally, as stated above, the court doubts, and can find no authority for the assertion, that an absolute assignment of rents can exist in North Carolina, regardless of the language of the agreement. According to the authorities cited above, North Carolina law clearly states that the enjoyment of the rents lies with the possessor of the property. In North Carolina, a mortgagee cannot get possession unless it brings an action at law and is awarded possession, gains constructive possession

through a receiver, or obtains possession by consent of the mortgagor in possession. None of these was accomplished by Lincoln.

■ Some cases in North Carolina appear to hold a second exception to the possession rule, by indicating that the mere *commencement* of a foreclosure proceeding serves to perfect a mortgagee's interest in rents, and that the mortgagee obtaining actual possession in not necessary. The language leading to this mistaken belief can be found in *Kistler v. Development Co.*, 205 N.C. 755, 757, 172 S.E. 413 (1933), where that court gave their interpretation of the status of the law at that time. The court stated that "the prevailing rule is that the mortgagee is not entitled to rents until entry is made *or a suit for foreclosure is begun.*" *Id.* at 757, 172 S.E. 413 (emphasis added). The *Kistler* court cites *Killebrew* and *S.B. Parker Co. v. Commercial Bank of High Point, N.C.*, 204 N.C. 432, 168 S.E. 681 (1933), as authority for this statement. This court can find no such language in *Killebrew*. In fact, *Killebrew* discussed at length the necessity of and requirements for obtaining a receiver upon the commencement of foreclosure proceedings. *Id.*, 104 N.C. at 189–190, 10 S.E. 159. As to *Parker*, the holding in that case was the same as that of *Killebrew*. The *Parker* court stated that the "right [to rents] arises only after the mortgagee or trustee has taken possession of the property," and no language in that case discusses the commencement of foreclosure proceedings as being a substitute for possession. *Id.*, 204 N.C. at 434, 168 S.E. 681. There is no valid authority in North Carolina supporting the assertion that commencement of foreclosure proceedings alone, with the mortgagor remaining in possession and no receiver in place, gives the mortgagee an interest in the rents and profits of the mortgaged property. Therefore, Lincoln can claim no rights to the rents and profits of the Debtor's building based upon its commencement of foreclosure proceedings.

Under North Carolina law, if Lincoln had been successful in its action for appointment of a receiver, its interest in the rents

and profits would have been in place. The court notes that Lincoln did everything possible to obtain possession of the mortgaged property, including petitioning in state court for the appointment of a receiver on three different occasions, conmencing foreclosure proceedings when necessary, and securing the placement of the settlement proceeds in a segregated account. Under North Carolina law, this sequestration is not a substitute for possession or the appointment of a receiver. The funds were merely sequestered awaiting a determination of their ownership in accordance with applicable law. Nor were the efforts to perfect by other means sufficient. North Carolina law clearly states that possession or constructive possession through a receiver are the only methods of perfecting an interest in the rents and profits of this mortgaged property. The foreclosure sale had not been completed on the date of the bankruptcy petition, and the state court, applying the provisions of North Carolina law, did not find that the appointment of a receiver was warranted. While Lincoln did everything in their power to protect their interests, the requirements of North Carolina law were not met despite those efforts.

### 2. Perfection by registration

Lincoln claims that, if it does not hold a perfected security interest in the rents and profits of the building by virtue of the above stated actions, it is nonetheless perfected due to the recording of its interest in the rents and profits in compliance with N.C.Gen.Stat. §§ 47–18 and 47–20.

In the North Carolina case of *First & Citizens National Bank of Elizabeth City, N.C. v. Sawyer*, 218 N.C. 142, 10 S.E.2d 656 (1940), the court was called upon to decide if a bona fide purchaser would prevail over a holder of a written assignment of rents.

> The question presented is: Did the failure to record the assignment ... of the rents and income derived from the lands in controversy ... render said assignment invalid as against the plaintiff, a subsequent purchaser ... for value without notice of such assignment? We are of the opinion, and so hold, that the ques-

tion was properly answered in the affirmative.

The court went on to discuss a reason for their decision:

> The plaintiff, as a purchaser, had a right to rely upon the public records of the county.... There was nothing in the public records to indicate any memorial of the lien *now attempted to be asserted* against the plaintiff.

*Id.* at 145, 10 S.E.2d 656 [citations omitted] [emphasis added]. The court further discussed the recordation problem and by way of dicta stated that an assignment of rents is a quasi-lease, which, if covering a period of more than three years, is governed by C.S. 3309, and must be registered to be effective. *Id.* at 146, 10 S.E.2d 656.

 The provisions of C.S. 3309 can now be found in N.C.Gen.Stat. §§ 47–18 and 47–20. The statutes provide that

> no ... [assignment of rents] shall be valid to pass any property as against lien creditors or purchasers for a valuable consideration from the grantor ..., but from the time of registration thereof as provided in this Article.

N.C.Gen.Stat. § 47–20. This is merely a recording statute that serves to protect third parties by giving record notice of a purported interest. Recordation does not serve to add to the substantive rights of a purported lien holder. *South Ga. Motor Co. v. Jackson*, 184 N.C. 328, 114 S.E. 478 (1922). Anyone at any time can register papers in compliance with this statute, but such recordation does not create a perfected security interest. The purpose of this statute is to prevent fraud, and liens registered under this article are still subject to the common law of North Carolina for determination of their validity. *Starke v. Etheridge*, 71 N.C. 240 (1874). The statute merely adds an additional requirement that a mortgagee must meet before successfully asserting an interest in rents and profits of a mortgaged property against third parties. It is designed to protect third parties and not those involved in this suit.

Since Lincoln holds no interest in these rents and profits, these rents, as settlement

proceeds or otherwise, do not constitute cash collateral of Lincoln as defined by § 363 of the Bankruptcy Code.

### Conclusion

Based upon the foregoing findings of fact and conclusions of law, the court concludes that Lincoln is not entitled to relief from stay to pursue its interests in the building, as Lincoln is over secured, the building is appreciating slightly, and therefore Lincoln is adequately protected. Due to the small equity cushion in the building and the possibility that appreciation will not be further realized, the court will afford Lincoln payments of interest to insure that it will not be harmed if appreciation does not occur as anticipated.

Under North Carolina law, Lincoln National held no interest in the rents and profits or the settlement proceeds of the Debtor at the time the Chapter 11 petition was filed. Lincoln cannot now perfect, post-petition, any interest it claims, due to the stay provisions of § 362 of the Bankruptcy Code. Therefore, the rents and profits of the building are not cash collateral of Lincoln, and the prohibition of their use cannot be ordered.

While the court does not conclude that sequestration of or the appointment of a receiver is appropriate for any insurance proceeds collected by Lincoln due to damage resulting from hurricane Hugo, any such proceeds collected shall be applied as stated below.

It is therefore, ORDERED:

1. That the Motion for relief from stay be DENIED;

2. That due to the small equity cushion that the Debtor holds in the building, along with the ever present possibility that the building may not appreciate as anticipated, the Debtor shall make monthly interest payments to Lincoln on the first day of each month beginning on March 1, 1990, and further that the Debtor shall also immediately tender to Lincoln interest payments for the months of January and February, 1990;

3. That the Motion for Order Prohibiting Use of Cash Collateral is DENIED;

4. That the Motion for Appointment of Receiver is DENIED;

5. That the Motion seeking Order Directing Sequestration of Rents/Profits and Insurance Proceeds be DENIED;

6. That any insurance proceeds realized by the Debtor in connection with damage done by hurricane Hugo are to be applied only to repair said damage, unless upon motion and due notice the court authorizes otherwise.