**In re WESTCHASE I ASSOCIATES, L.P., a Delaware Limited Partnership, Debtor.**

**WESTCHASE I ASSOCIATES L.P.**

**v.**

**LINCOLN NATIONAL LIFE INSURANCE COMPANY.**

**Nos. C–C–90–0107–MU, C–C–90–0093–MU.**

United States District Court, W.D. North Carolina, Charlotte Division.

Jan. 15, 1991.

---

J. William Porter, Stephen R. Hunting, Parker Poe Adams & Bernstein, Charlotte, N.C., for plaintiff.

Travis W. Moon, Karen S. Williams, Rayburn Moon & Smith, P.A., Charlotte, N.C., for defendant.

MULLEN, District Judge.

This matter is before the court on appeal from a final order of the bankruptcy court in the bankruptcy of Westchase I Associates, L.P. Both the debtor Westchase and Lincoln National Life Insurance Company, a secured creditor, have filed appeals. Lincoln appeals the ruling of the bankruptcy court involving the distribution of rents from a building development which is the principal asset of the bankrupt estate, and Westchase appeals the requirement of monthly interest payments for the protection of Lincoln's "equity cushion" in that building.

## I. FACTUAL HISTORY

The pertinent business relationship between the parties began in 1986 when Westchase acquired title to the building subject to previously existing security agreements and collateral loan documents in favor of Lincoln which secured a loan in the original principal amount of $10.2 million. Among these documents was an "assignment of rents" by which Westchase assigned rents due from the building's tenants to Lincoln. The assignment allowed Westchase to collect these rents until (and unless) it defaulted on the primary mortgage. Before Lincoln would have been able to collect the rents, Westchase would have to become delinquent in its payments, Lincoln would have to provide Westchase notice of the default, and a 10 day grace period during which Westchase could cure the default would have to expire.

In 1989 Westchase began experiencing financial difficulties due to the failure of one of the building's tenants to pay its rent. Eventually, Lincoln initiated fore-

closure proceedings against the property in the North Carolina courts and sought the appointment of a receiver to collect the rents from the building's tenants. On 6 October 1989, prior to the hearing for the appointment of a receiver, Westchase I Associates filed for relief in the bankruptcy court under Chapter 11.

At the time of the filing Westchase was indebted to Lincoln for slightly less than $10.7 million. The bankruptcy court found that the building, which secured this debt, had a value of approximately $10.85 million, was appreciating slightly and had an excellent chance of appreciating to $13 million within a reasonable period of time. Thus, at the time of the filing, Lincoln was an oversecured creditor with an equity cushion of approximately $100,000 to $200,000. Due to the accrual of interest on the debt and the thinness of the equity cushion, Lincoln's posture as an oversecured creditor was precarious at best.

In order to maintain Lincoln's status as an oversecured creditor with a thin equity cushion the bankruptcy judge ordered Westchase to pay monthly interest installments to Lincoln. In addition, the bankruptcy judge ruled that Lincoln had not perfected its interests in the rents and profits of the building under North Carolina law and was not entitled to collect the future rents generated by the building. Both of these rulings have been appealed.

## II. PROTECTION OF THE EQUITY CUSHION

Westchase has appealed the bankruptcy court's order that it make a monthly interest payment to maintain the equity cushion possessed by Lincoln. The bankruptcy court, citing *In re United States Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988), noted that a secured creditor is entitled to adequate protection of the value of its collateral on the petition date. One such protection, found in § 362(d)(2) is relief from the stay against foreclosure imposed by § 362(a) if: (1) the debtor does not have equity in the collateral; and (2) the collateral is not nec-

essary to an effective reorganization. *Id.* at 369–70, 108 S.Ct. at 629–30. However, the bankruptcy court determined that neither prong of this test could be met.

The only other basis for relief from § 362(a) stay is found in 362(d)(1) which allows the stay to be altered "for cause, including the lack of adequate protection of an interest in [the] property ..." Because the bankruptcy court did order relief from the stay in the form of monthly interest payments during the pendency of the stay, it would appear such relief could only have been grounded in this provision of § 362(d)(1). The bankruptcy court itself said that the payments were ordered due "to the ever present possibility that appreciation of the property ... may not be realized within a reasonable time." *Order*, 21 February 1990, p. 9. 119 B.R. 521.

Ordering monthly interest payments, however, first requires a determination that there exists a "lack of adequate protection of an interest in [the] property" on the part of Lincoln. In *Timbers*, however, the Supreme Court determined that the "value" of a creditor's interest in property that merited protection was the "value of the collateral." *Timbers*, 484 U.S. at 372–73, 108 S.Ct. at 630–31. Thus, if the value of the property itself is not declining, as is the case here, the creditor would not be entitled to protection of the accruing interest value of the claim. *Accord, In re Lane*, 108 B.R. 6 (Bankr.Mass.1989); *See also, Timbers*, 484 U.S. at 372–73, 108 S.Ct. at 630–31. Finally, of note in *Timbers*, is the comment of the Court that oversecured creditors "interest payments come only out of the 'cushion' in which the oversecured creditor *does have* a perfected security interest." *Timbers* at 374, 108 S.Ct. at 631. Certainly, had the Court or Congress intended that creditors who were only marginally oversecured receive interest payments to maintain their status, which might detrimentally affect undersecured creditors, they could have clearly expressed that intention. Because the import of *Timbers* appears to require that oversecured creditors forego the receipt of interest payments on the value of their claim during

the re-organization period, whether that forbearance destroys their "equity cushion" or not, the bankruptcy court's requirement of monthly interest payments to protect the equity cushion during the re-organization period will be overruled.

### III. ASSIGNMENT OF RENTS AND PROFITS

■ Lincoln has also sought the rents and profits generated by the building and assigned to Lincoln. The determination of whether a mortgagee has an interest in the rents and profits of the mortgaged property is a question of North Carolina law. *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). Although this decision by the Supreme Court was rendered under the Bankruptcy Act of 1898, its rationale has been used by federal courts interpreting the Bankruptcy Code of 1978:

> "The policy considerations and federalism concerns that underpin the *Butner* decision are just as applicable to the new code as they were to the 1898 Act." *In the Matter of Village Properties Ltd.*, 723 F.2d 441, 446 (5th Cir.1984).

So, while Lincoln may have a remedy under § 363 of the Code to protect any interest it has in the rents and profits of the building, its right to those rents—the creation of its interest in those rents—is purely a matter of North Carolina law.

North Carolina cases have required that creditors obtain the appointment of a receiver or possession of the property before they may collect the rents from a property. *Killebrew v. Hines*, 104 N.C. 182, 10 S.E. 159 (1889). This notion seems likely to have been rooted in the common law doctrine that a mortgagee could take possession prior to default unless the mortgage documents provided otherwise. *e.g. Brannock v. Fletcher*, 271 N.C. 65, 71, 155 S.E.2d 532, 539 (1967); *See also, Coor v. Smith*, 101 N.C. 261, 7 S.E. 669 (1888). As noted in *Brannock*, modern equitable doctrines altered the common law rule and provide that the mortgagor is entitled to remain in possession at least until breach

of the conditions of the mortgage. *Brannock*, 271 N.C. at 71, 155 S.E.2d at 539.

The question thus exists as to whether "modern equitable doctrines," which developed to deprive the mortgagee of a right to immediate possession absent a breach, also developed to allow that mortgagee some method other than outright seizure of the mortgaged property before being entitled to the rents and profits. Examination of the North Carolina cases indicates that mortgagees may rely on their documentation.

■ *Killebrew v. Hines* cannot be relied upon to now require that mortgagees must accomplish actual or constructive possession of the property regardless of the agreements which may exist. *Killebrew* involved the rights of a third party intervening creditor who acquired an agricultural lien held to be superior to the vendor's reserved "mortgage upon crops to be made" which was not recorded. *Killebrew v. Hines*, 104 N.C. at 194, 10 S.E. at 162. That court seemed to contemplate that the parties could enter into agreements regarding rents noting:

> "It may be that the crops can be thus charged as between the parties after severance but before actual removal from the land." *Id.*, 104 N.C. at 190, 10 S.E. at 162

*Credle v. Ayers*, 126 N.C. 11, 35 S.E. 128 (1900) seems to clearly contemplate that the parties could agree upon the disposition of the rents as the court there noted:

> "The defendant contends that he is not liable for mesne profits, and relies upon *Killebrew v. Hines*, 104 N.C. 182, 10 S.E. 159, 251 [sic]; *Carr v. Dail*, 114 N.C. 284, 19 S.E. 235; and *Hinton v. Walston*, 115 N.C. 7, 20 S.E. 164. Those cases hold that a vendee or mortgagor, before or after breach, who is permitted to retain possession, is entitled to the rents and profits (*unless there is an express stipulation in the contract or mortgage to the contrary*, as in *Crinkley v. Egerton*, 113 N.C. 444, 18 S.E. 669; *Jones v. Jones*, 117 N.C. 254, 23 S.E. 214); but here the withholding by the defendant, after action brought in December, 1894,

was wrongful, and he became liable, like any other defendant in ejectment, for the mesne profits." [emphasis added]. *Credle*, 126 N.C. at 14–15, 35 S.E. at 128. That court further noted:

"That [surrender of possession] did not release the defendant's liability for rents and profits for 1895, during the wrongful withholding, *unless there had been a stipulation to that effect.*" [emphasis added]. *Id.*, 126 N.C. at 15, 35 S.E. at 128–29.

While it is true that landlord's liens were involved in both *Egerton* and *Jones*, it is instructive to note that the "leases" involved in those cases were lease-purchase agreements and arguably represented contractual arrangements made in response to the result of *Killebrew*. That is, the lease-purchase agreements may have been designed for the specific purpose of placing the vendor in the position of landlord and therefore, at that time, as the superior lien holder. The opinion by Justice Clark contains language apropos today:

"A person may so use his own property as not to injure or infringe upon the rights of others, which society undertakes to protect. Upon this principle, one has the right and the power to dispose of his property, when and how he may elect, if the law, for sufficient reason, has not declared the contract illegal, immoral, or contrary to public policy, and therefore void." *Crinkley v. Egerton*, 113 N.C. at 447–48, 18 S.E. at 670.

Thus, it would appear in *Credle* that the court properly characterized those cases as standing for the principle that the parties may, by agreement, alter the common-law result articulated in *Killebrew*.

By 1933 the North Carolina supreme court apparently felt this was sufficiently established to note in *Kistler v. Wilmington Development Co.*, 205 N.C. 755, 172 S.E. 413, (1933):

"*In the absence of a stipulation to the contrary*, a mortgagor of real property who is permitted to retain possession is entitled to the rents and profits." [emphasis added]. *Id.*, 205 N.C. at 757, 172 S.E. at 414.

Whether this tracing of North Carolina law is correct or not, it is clear that more recent cases since *Killebrew* contemplate that the parties may contract with reference to the rents.

■ Thus it seems that Westchase and Lincoln were free to "stipulate to the contrary" with reference to the rents to the commercial office building. Examination of the documents involved reveals clearly expressed intent by the debtor to grant a security interest to Lincoln in the rents.

■ North Carolina recognizes a difference between rents which have already accrued and rents which will be accruing in the future. Already accrued rents are personalty (choses in action) while rents accruing in the future are incorporeal hereditaments—interests in real property. *First & Citizens National Bank of Elizabeth City v. Sawyer*, 218 N.C. 142, 10 S.E.2d 656 (1940). Thus the recordation of the deed of trust was necessary to perfect the security interest in rents accruing in the future. NCGS §§ 47–18 and 47–20 are not mere notice statutes for the protection of third parties. To the contrary, recordation is vital to the acquisition of ownership. *E.g. Hayes v. Ricard*, 245 N.C. 687, 97 S.E.2d 105 (1957).

■ While it is true that as between the parties a conveyance of an interest in real property is valid without recordation, only with recordation is it possible to exclude intervening third parties *New Home Building Supply Co. v. Nations*, 259 N.C. 681, 131 S.E.2d 425 (1963). It is the exclusion of third parties which is the essence of perfection of a security interest. *See, e.g.*, NCGS § 25–9–301. Thus the recordation accomplished perfection of Lincoln's security interest in rents accruing. Perfection of Lincoln's security interest does not equate with enforcement of the perfected assignment, however. From the record before the court it appears Lincoln had not completed the necessary steps to enforce the assignment. It is true that Lincoln had vigorously attempted to do so, but without success. Therefore, in order to collect the rents under the perfected assignment, Lin-

coln will now have to seek enforcement and relief from the bankruptcy court, just as it initially had sought enforcement through the appointment of a receiver in state court proceedings.

The court is aware that this analysis raises issues which were not dealt with in the proceedings before the bankruptcy judge, among which may be included:

1. Whether the sums paid by Bojangles were rent, general damages or something else; and, if rent, did Lincoln have a perfected security interest in the rents which had accrued and lost their character as incorporeal hereditaments.

2. Whether the rents accruing are cash collateral.

3. Whether Lincoln is adequately protected with reference to its security interest in the rents.

Other additional issues may arise as well. In any event it is necessary to remand this matter to the bankruptcy court for proceedings consistent with this opinion. In such proceedings, this court commends the case of *In re Raleigh/Spring Forest Apartment Associates*, 118 B.R. 42 (Bankr.E.D. N.C.1990), decided subsequent to the bankruptcy court's order which is the subject of the present appeal, for consideration.

IT IS THEREFORE ORDERED, that the case shall be remanded to the bankruptcy court for further proceedings, not inconsistent with this order.