## In re CARLEY CAPITAL GROUP, Debtor.

### Bankruptcy No. MM11–89–00587.

United States Bankruptcy Court, W.D. Wisconsin.

March 20, 1991.

See also 119 B.R. 646.

Howard A. Schoenfeld, Godfrey & Kahn, Milwaukee, Wis., for debtor.

William F. Potts, Jr., Petree Stockton & Robinson, Charlotte, N.C. and Kenneth B. Axe, Lathrop and Clark, Madison, Wis., for First Union Nat. Bank of North Carolina.

Susan V. Kelley, Murphy & Desmond, S.C. and Sheree Gowey, Asst. U.S. Atty., Madison, Wis., for Gleischman Sumner Co.

## MEMORANDUM DECISION

### ROBERT D. MARTIN, Chief Judge.

Gleishman Sumner Company has objected to the motion of First Union National Bank of North Carolina to recover payment of loan balances and costs of collection from a pair of accounts designated the "Cash Collateral Account" and the "Allstate Collateral Account." Both accounts hold rents derived from property on which First Union holds mortgages and rent assignments. The background facts follow:

The debtor, Carley Capital Group, is indebted to First Union National Bank of North Carolina ("First Union") for various loans, the proceeds of which financed, among other things, an office building known as "University Place," located in Charlotte, Mecklenburg County, North Carolina. The loans are secured by an "Assignment of Lessor's Interest in Lease," dated August 29, 1985 and recorded August 30, 1985 with the register of deeds, and a "Deed of Trust, Assignment of Rents and Security Agreement" dated July 1, 1987, and recorded with the register of deeds on July 2, 1987, all relating to University Place. Uniform Commercial Code ("UCC") financing statements covering both fixtures and rents and profits were properly filed with the register of deeds and the secretary of state.

On August 25, 1988 the debtor and Allstate Insurance Company ("Allstate") entered into a lease pursuant to which the debtor agreed to lease Allstate approximately 35,050 square feet of space in University Place for an initial term of five years, with the term to begin on July 1, 1989.[1] The debtor was obligated under the terms of the Allstate Lease to construct certain improvements at an estimated cost of $1,085,073.00. First Union agreed to lend the debtor the necessary funds, and had its lawyers prepare the loan documents. Before the loan was closed, however, another bank obtained a pre-judgment order of attachment against University Place.

The debtor and First Union thereafter agreed to restructure the loan as an advance under the "Infrastructure Loan," but on March 10, 1989 an involuntary petition was filed against the debtor, again preventing the parties from closing the loan. Thereafter, First Union agreed to lend the funds to the debtor under 11 U.S.C. § 364(d),[2] and a "Post–Petition Loan

---

1. The lease was twice amended, once on February 1, 1989 and again on March 28, 1989.

2. 11 U.S.C. § 364(d) provides:
   (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

       (A) the trustee is unable to obtain such credit otherwise; and
       (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.
   (2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

Agreement" ("Loan Agreement"). On May 17, 1989 this Court entered an Order authorizing the debtor, pursuant to Section 364(d), to borrow up to $1,085,073.00 from First Union. The terms of the Order are largely similar to and incorporate by reference except as otherwise modified, the terms of the Loan Agreement and supporting documents. Also on May 17, 1989 the debtor executed a post-petition Note in the principal amount of $1,085,073.00. Pursuant to the Note, principal and interest were due on October 31, 1989. The Note is secured by a Deed of Trust and a Lease Assignment, recorded with the register of deeds. UCC financing statements covering both fixtures and rents and profits were properly filed.

The Deed of Trust provides that until default on the Note, the debtor may continue to collect the rents and profits without accounting to First Union. After default, First Union may enforce its interest in the rents in a variety of ways. An event of default under the Loan Agreement is designated a default under the Deed of Trust. The Loan Agreement specifically includes failure to pay principal or interest on the Note when due as an event of default.

First Union advanced $483,528.27 under the Loan Agreement and Note. The debtor defaulted by failing to pay the principal and accrued interest at the Note's maturity on October 31, 1989.

On July 31, 1990 a liquidating Chapter 11 plan was confirmed. Gleishman Sumner Co. ("G.S.C.") was appointed pursuant to that plan for the purposes of liquidating the debtor's assets.

Allstate pays monthly rentals of approximately $37,000.00 which are deposited in a separate deposit account entitled "Allstate Collateral Account." G.S.C. has turned over the monies in this account to First Union to be applied to the balance of the post-petition Loan. There remains due, exclusive of professional fees and expenses, something in excess of $88,444.75.

The remaining University Place leases generate approximately $33,238.00 per month, all of which is deposited in a separate deposit account entitled "Cash Collat- eral Account." As of late November, 1990, this account held approximately $260,-000.00.

The costs and expenses of operating the office building have been paid pro rata from the Allstate Account and the Cash Collateral Account. 1990 ad valorem real property taxes in the amount of $69,052.28, which are currently due, have not been paid. First Union has stated that the pro rata portion of the taxes which should be paid from the Cash Collateral Account is $37,978.75. G.S.C. has not objected.

On November 21, 1990 University Place was sold at a foreclosure sale for $5,500,-000.00. The parties concede that First Union will still have a considerable deficiency after all of its collateral is foreclosed.

First Union seeks payment of the amounts due under both the pre-petition Loans and the Post–Petition Loan as well as recovery of $70,028.03 in attorneys fees and expenses. Of the fees and expenses, approximately $12,000.00 were incurred pre-petition in connection with the preparations for the loans which were not consummated. Recovery of these amounts is sought from the funds in the Cash Collateral Account.

## I.

G.S.C. disputes that First Union's 11 U.S.C. § 364(d) lien extends to the funds in the Cash Collateral Account. G.S.C. claims the Loan Agreement contains provisions which specifically pledge the Allstate Lease while omitting such a specific pledge of the non-Allstate leases, "[t]he only possible reference to the nonAllstate leases is in the postpetition deed of trust in a preprinted provision which states that future rents and profits are assigned to the Beneficiary," and that "none of the parties directed much attention to the boilerplate." Despite the fact that the post-petition Deed of Trust was preprinted, various sections of the document were crossed out and other words typed into the document, so one or both of the parties must have at a minimum read and approved or rejected the preprinted provisions. Furthermore, Ex-

hibit "A" to the Deed of Trust specifies that First Union's security extends to "all the rents, issues and profits" of the property. In addition, the Loan Agreement defines "office building" to include "all proceeds thereof." G.S.C. is thus mistaken in its assertion that the preprinted portion of the Deed of Trust is the "only possible" reference to the non-Allstate leases.

G.S.C. also claims that the Allstate lease proceeds and non-Allstate lease proceeds were separated into two accounts to enable the debtor and the Creditors Committee to preserve their arguments with respect to attachment of First Union's liens to the non-Allstate rents, and asserts that "[s]ince the parties agreed to preserve their arguments concerning the attachment of liens to the nonAllstate rents, it would have been completely inconsistent for the parties to agree that the lien of the postpetition loan attached to those rents." However, it is clear that the parties were not referring to post-petition non-Allstate rents, because the parties could determine at the time of entering the Loan Agreement whether they intended the Section 364(d) lien to attach to post-petition non-Allstate rents; there was no logical reason for the parties to preserve arguments concerning a provision which was not yet the subject of a contract.

The Order approving the Loan Agreement states: "The Bankruptcy Court has not determined whether the rents and profits derived from the Office Building constitute cash collateral as defined in Section 363(a) of the Bankruptcy Code for the First Union Liens, and each party reserves all rights with respect to such issue." "First Union Liens" are defined in the Order to encompass the "Office Building Loan, Infrastructure Loan, Consolidating Loan, General Assignment, and the UCC–1's," *not* the post-petition Loan. Thus, each party was reserving rights only with respect to whether rents allegedly securing loans which predated the filing of the debtor's bankruptcy petition constitute cash collateral, not whether rents allegedly securing

the post-petition Loan constitute cash collateral.

G.S.C. further argues that if First Union were intended to have a post-petition lien on the Cash Collateral Account, the Loan Agreement would not state that upon default, the funds in the Allstate Account could be applied by First Union to the outstanding balance of the Post–Petition Loan, while requiring the debtor, before using the funds in the Cash Collateral Account, to obtain the consent of First Union or "the determination by the Bankruptcy Court ... that the interest of First Union in the Cash Collateral Account is adequately protected or that Borrower [the debtor] is otherwise entitled to use said funds, for any reason, including without limitation that the rents and profits in the Cash Collateral Account are not 'cash collateral' within the meaning of Section 363(a) of the Bankruptcy Code." Instead, it is contended, if First Union were to have a post-petition lien in the Cash Collateral Account, "the agreement would simply have provided that the Bank could apply the cash collateral account to its postpetition loan." The argument would be well-taken if the provision were to refer only to post-petition rents, rather than both pre- and post-petition rents. However, due to the dispute concerning whether First Union possesses a perfected interest in the pre-petition non-Allstate rents, it makes perfect sense to differentiate between the two accounts upon a default by the debtor.

■ Furthermore, a creditor is not entitled to immediate possession of cash collateral simply because the creditor possesses a perfected, secured interest in the collateral. If a creditor is adequately protected without the receipt of the cash collateral, the debtor may be authorized to use the cash collateral under 11 U.S.C. § 363.[3] The parties may very possibly have bargained for First Union's immediate right to apply funds in the Allstate Account to the outstanding balance of the post-petition

---

3. *See, e.g., In re Dotz*, MM11–90–01864, slip op at 6 (Bankr WD Wis, January 4, 1991) ("If a creditor is adequately protected without the receipt of cash collateral, the debtor may be authorized to use the cash collateral under Section 363; if not, the use must be prohibited or conditioned as is necessary to provide the protection. 11 USC § 363(e).").

Loan in return for its agreement to potential treatment under Section 363 with respect to the non-Allstate accounts. It is reasonable for the parties to include an adequate protection provision in their agreement, rather than giving all the rents immediately to First Union, in order that the debtor might have a potential source of cash flow.

In light of the language contained in the Deed of Trust granting First Union security in future rents, the language contained in Exhibit "A" to the Deed of Trust specifying that First Union's security extends to "all the rents, issues and profits" of the property, and the definition of "office building" in the Loan Agreement to include "all proceeds thereof," it is apparent that First Union's lien extends to funds in the "Cash Collateral Account."[4]

## II.

In *Butner v. United States*, 440 U.S. 48, 56, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979), the United States Supreme Court held that "the federal bankruptcy court should take whatever steps are necessary to ensure that the mortgagee is afforded in federal bankruptcy court the same protection he would have under state law if no bankruptcy had ensued."[5] Because the office building is located in North Carolina, the law of the State of North Carolina controls the determination of rights in the property.

G.S.C. argues that First Union's security interest in pre-petition rents and profits is unperfected because First Union did not take either actual or constructive possession (i.e., through the appointment of

a receiver) of the office building prior to the filing of the debtor's bankruptcy petition. However, the primary case upon which G.S.C. relies to support this position, *In re Westchase I Associates, L.P.,* 119 B.R. 521 (Bankr.W.D.N.C.1990), was recently remanded on appeal, the district court having determined, after analyzing North Carolina law, that the parties may by contractual agreement dispense with the common law actual-or-constructive possession requirement, such that recordation accomplishes perfection of a security interest in future rents. *In re Westchase I Associates, L.P.,* 126 B.R. 692 (W.D.N.C.1991). The district court's analysis of North Carolina law in *Westchase* included consideration of cases which suggest that the common law possession requirement is not immutable. The district court quoted from *Credle v. Ayers:*

> The defendant contends that he is not liable for mesne profits, and relies upon *Killebrew v. Hines,* 104 N.C. 182, 10 S.E. 159, 251 [sic]; *Carr v. Dail,* 114 N.C. 284, 19 S.E. 235; and *Hinton v. Walston,* 115 N.C. 7, 20 S.E. 164. Those cases hold that a vendee or mortgagor, before or after breach, who is permitted to retain possession, is entitled to the rents and profits (*unless there is an express stipulation in the contract or mortgage to the contrary,* as in *Crinkley v. Egerton,* 113 N.C. 444, 18 S.E. 669; *Jones v. Jones,* 117 N.C. 254, 23 S.E. 214)[.]

*In re Westchase I Associates, L.P.,* 126 B.R. 692, 695–96 (W.D.N.C., 1991), *citing Credle v. Ayers,* 126 N.C. 11, 14–15, 35 S.E. 128 (1900) (emphasis in *Westchase*). Similarly, in *Kistler v. Wilmington Development Co.,* 205 N.C. 755, 757, 172 S.E. 413, 414 (1933), the court stated that *"[i]n the*

---

**4.** In so deciding, G.S.C.'s argument that "[t]he difference between the original transaction and the final Consent Order is relevant to the issue of the collateral for the postpetition loan" is rejected. The Loan Agreement provides that it "constitutes the entire understanding of the parties with respect to the Post–Petition Loan and any prior negotiations, whether written or oral, with respect thereto are superseded hereby." The parol evidence rule prevents G.S.C. from introducing evidence of any prior written or oral agreements of the parties which would contradict those provisions of the Order and sup-

porting documents referring to the granting of an interest in *all* rents from the office building.

**5.** Although *Butner* was decided under the 1898 Bankruptcy Act rather than the 1978 Bankruptcy Code, courts have generally applied *Butner* in interpreting the Code. *See e.g., In the Matter of Village Properties, Ltd.,* 723 F.2d 441, 446 (5th Cir.1984) ("The policy considerations and federalism concerns that underpin the *Butner* decision are just as applicable to the new code as they were to the 1898 Act."); *cf., In re Gotta,* 47 B.R. 198 (Bankr.W.D.Wis.1985).

*absence of a stipulation to the contrary,* a mortgagor of real property who is permitted to retain possession is entitled to the rents and profits." (emphasis supplied). Both these cases support the proposition that parties may contract with respect to the rents from real property so as to render the general common law rule regarding possession inapplicable to the terms of their agreement.

The district court in *Westchase* commended to the bankruptcy court for use in the remand proceedings the case of *In re Raleigh/Spring Forest Apartment Associates,* 118 B.R. 42 (Bankr.E.D.N.C.1990). In *Raleigh/Spring Forest,* two rent assignments were in issue, each of which provided that the debtor therein would be entitled to the rents until there was a default, at which time the lender, "at its option," had the right to take possession of the property and to collect the rents. The assignments also provided that the lenders could, upon default, collect the rents without taking possession of the property. *Raleigh/Spring Forest,* 118 B.R. at 43. In the present case, the Assignment of Lessor's Interest in Lease similarly provides that upon default, First Union may, "at its option without notice ... take possession of the premises ... and have, hold, manage, lease and operate the same ... and either with or without taking possession of the premises in its own name, demand, sue for or otherwise collect and receive all rents, income and profits of the premises."

In *Raleigh/Spring Forest,* the court addressed the nature of the security interest created by a rent assignment in North Carolina, explaining that:

> In North Carolina, a mortgagor is entitled to the rents arising from the real estate until the mortgagee takes possession of the property or until a receiver is appointed. (citation omitted).
>
> The parties to a mortgage, however, may specify by contract that the mortgagee rather than the mortgagor shall be entitled to the rents. Where the assignment is security for the underlying indebtedness and the agreement is that the mortgagor is entitled to have the rents until default, the assignment, however, is not absolute; it is conditional. The mortgagee's right to the rents is not complete, even upon default, until the mortgagee takes some affirmative action to enforce the collection of rents. For example, the mortgagee may have a receiver appointed or may take physical possession of the property.

*Raleigh/Spring Forest,* 118 B.R. at 44.

■ The *Raleigh/Spring Forest* court, citing N.C.Gen.Stat. §§ 47–18 and 47–20, stated that "[i]n North Carolina rent assignments must be recorded to be perfected," and determined that the rent assignments in that case had been properly recorded. *Id.,* 118 B.R. at 45. As N.C.Gen. Stat. § 47–18(a) specifies registration "in the county where the land lies," one must assume that the court was referring to filing with the register of deeds. *See also In re Westchase I Associates, L.P.,* 126 B.R. 692, 696 (W.D.N.C., 1991). Both of First Union's rent assignments were recorded with the register of deeds in the county where the office building stands, and thus these rent assignments, too, have been properly recorded.[6]

**6.** That rent assignments require recording with the register of deeds rather than filing with the secretary of state in order to be perfected is made clear by N.C.Gen.Stat. § 25–9–104(j), which provides that "This article [Article 9] does not apply except to the extent that provision is made for fixtures in G.S. 25–9–313, to the creation or transfer of an interest in or lien on real estate, including a lease or rents thereunder[.]" The North Carolina Comment to this subsection states that "[s]ubsection (j) makes it clear that whether or not rents from or lease on real property are, by applicable State law, considered personal property, this article does not apply to security interests therein. G.S. 47–20.4, which provides for the place of registration of chattels real, continues in effect, as do all other statutes affecting security interests in real property." N.C.Gen.Stat. § 47–20.4 provides that "[t]o be validly registered pursuant to G.S. 47–20, a deed of trust or mortgage of a leasehold interest or other chattel real must be registered in the county where the land involved lies, or if the land involved is located in more than one county, then the deed of trust or mortgage must be registered in each county where any portion of the land involved lies in order to be effective as to the land in that county."

At the time of filing of the debtor's petition in bankruptcy in *Raleigh/Spring Forest,* the debtor was not in default on either obligation, and was both in possession of, and collecting the rents from, the property. *Raleigh/Spring Forest,* 118 B.R. at 44. The *Raleigh/Spring Forest* court noted that "[i]t is true that the assignees had not taken the necessary steps to *enforce* the assignments and were not entitled to the rents, but they still had a conditional right to the rents and that right was properly *perfected." Id.,* 118 B.R. at 45 (citation omitted; emphasis supplied). Like the assignees in *Raleigh/Spring Forest,* First Union in the instant case had not, prior to the filing of the debtor's bankruptcy petition, taken the steps necessary to enforce its assignments and was not entitled to the rents, but it still had a conditional, properly perfected right to the rents.[7]

The *Raleigh/Spring Forest* court determined that:

"[a] creditor who had no right to the rents prepetition should not automatically have that right merely because a bankruptcy petition has been filed. The assignee must take those affirmative actions before the lien is enforceable. (citation omitted). The stay prohibits the assignee from taking those actions, but the assignee is not without a remedy.

*Id.,* 118 B.R. at 45. Similarly, in *Westchase,* the district court stated that:

Perfection of Lincoln's security interest does not equate with enforcement of the perfected assignment, however.... [I]n order to collect the rents under the perfected assignment, Lincoln will now have to seek enforcement from the bankruptcy court, just as it initially had sought enforcement through the appointment of a receiver in state court proceedings.

*In re Westchase I Associates, L.P.,* 126 B.R. 692, 696–97 (W.D.N.C., 1991).

Citing the previously-quoted passage from *Butner* to the effect that the mortgagee is entitled to the same protection in federal bankruptcy court that the mortgag-

ee would have under state law if no bankruptcy had ensued, the *Raleigh/Spring Forest* court stated that "[w]hat this means is that the assignee may ask the bankruptcy court to authorize those actions necessary to enforce the assignment and thereby complete the assignee's entitlement to the rents." *Raleigh/Spring Forest,* 118 B.R. at 46.

■ First Union is now before the court seeking authority for the "actions necessary to enforce" its perfected security interest in the rents. Specifically it seeks: 1.) a determination by this court that it possesses under 11 U.S.C. § 552(b) a perfected security interest in the post-petition rents and profits of the office building; and 2.) entry of an Order, consistent with Article IV, Section 4.1(p)(v) of the confirmed Plan, authorizing it to apply the proceeds of the Cash Collateral Account to the outstanding amount of the pre-petition Loans.

11 U.S.C. § 552(b) provides:

Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, rents, or profits of such property, then such security interest extends to such proceeds, product, offspring, rents, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

None of the exceptions of Section 552(b) applies to the facts of the present case. It has already been determined that First Union, by virtue of its properly recorded Assignment of Rents, possesses a perfected

---

**7.** As the *Raleigh/Spring Forest* court stated: "A properly filed rent assignment may be perfected even though it is not enforceable. Seizure is not necessary for the 'perfection' of the rent assignment[.]" *Raleigh/Spring Forest,* 118 B.R. at 46.

security interest in the pre-petition rents of the office building. Thus, pursuant to Section 552(b), that security interest extends to rents acquired after the filing of the debtor's petition as well, to the extent provided by the terms of the Assignment.

Article IV, Section 4.1(p)(v) of the confirmed plan authorizes First Union to apply to proceeds of its collateral to payment of the pre-petition Loans in accordance with the provisions of its Loan documents. First Union's entitlement to the post-petition rents having been determined, First Union is authorized to apply the post-petition rents contained in the "Cash Collateral Account" against the balances owing on the pre-petition Loans.

### III.

■ G.S.C. contends that First Union's Motion for Payment of the Post–Petition Loan and Reimbursement of Professional Fees and Expenses "is in effect a request for payment of an administrative claim." It notes that although all administrative claims were required to be filed by July 12, 1990, First Union's Motion was not filed until October 22, 1990, and that its "claim" should therefore be barred.

With respect to professional fees and expenses, the Court's Order provides:

> The Debtor shall promptly reimburse First Union for all reasonable actual out-of-pocket attorney, appraiser, and other professional fees and expenses incurred by First Union in connection with the negotiation, documentation and closing of the loan authorized hereunder, as well as such fees and expenses incurred by First Union for the attendance of its counsel, appraiser and representatives in this Court at the hearing on the Motion.

The Order further provides that:

> all monies advanced to the Debtor pursuant to the Loan Agreement (including, without limitation, the principal thereof, interest thereon and costs and expenses owing in connection therewith) shall be

secured by a continuing, perfected and enforceable security interest and lien in the Office Building, the Allstate Lease, the Plans and Specifications and the Construction Contract senior to and superior to the First Union Liens and the Attachment Lien pursuant to Section 364(d) of the Bankruptcy Code, all as more particularly described in the Loan Agreement.

Furthermore, Article IV, Section 4.1(p)(xii) of the confirmed plan of reorganization provides that "First Union and the Creditors' Committee shall retain all rights with respect to ... reimbursement of First Union for its legal fees and expenses in connection with the negotiation, documentation, Court approval and consummation of the post-petition loan." Clearly, First Union's motion seeks recovery of fees and expenses not as an administrative claim under 11 U.S.C. § 503, but rather in connection with its Section 364(d) lien on the accounts in question. The motion is not barred as an untimely administrative claim.

### IV.

G.S.C. contends that the $70,028.03 in professional fees and expenses sought by First Union are not reasonable and asserts that First Union should not be reimbursed for its fees and costs incurred pre-petition. First Union concedes that $12,000.00 of the $70,028.03 total is attributable to pre-petition services, but "believes that it should be reimbursed for the pre-petition fees and expenses itemized in the Motion as such fees and expenses were incurred in connection with the preparation of loan documents for the upfitting loans which never closed but were subsequently used with little modification in connection with the Post–Petition Loan."

■ First Union is not entitled to payment of pre-petition fees and expenses under its Section 364(d) lien. Whether First Union is entitled to payment of its pre-petition fees and expenses under 11 U.S.C. § 506(b) is a different question.[8]

---

**8.** Section 506(b) provides:

To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this sec-

tion, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reason-

The parties have conceded that after foreclosure of all its security, First Union will still possess a considerable deficiency. Because the "First Union Liens" (all pre-petition) are undersecured, First Union is not entitled to payment of its pre-petition fees and expenses under Section 506(b). To allow First Union to recover its pre-petition fees and expenses under the Section 364(d) lien would effectively cross-collateralize these fees and expenses. Such a result violates the priority scheme of the Bankruptcy Code, where, as here, First Union's pre-petition debt is undersecured. However, in this case the disallowance of the pre-petition expenses under Section 364(d) has little practical effect. They may still be proper pre-petition charges under the lending agreements between the parties then in force, and, in light of the insufficiency of collateral, be made part of the deficiency which will be discharged to the extent not paid as an unsecured claim under the confirmed plan.

G.S.C.'s remaining objections concerning professional fees and expenses are not similarly well-taken. The remaining fees and expenses have been reasonable, and accordingly First Union's motion for payment of professional fees and expenses to the extent of $58,028.03 must be granted.

## V.

G.S.C. argues that "[u]nder the equitable theory of marshaling, First Union should be required to look to the office building for repayment of the postpetition loan, to enable the estate to realize upon the rents." The doctrine of marshalling is recognized in North Carolina. *Matter of Mills,* 40 B.R. 72, 75 (Bankr.E.D.N.C.1984), *citing Dixieland Realty Co. v. Wysor,* 272 N.C. 172, 158 S.E.2d 7 (1967). The *Mills* court described the doctrine of marshalling:

The doctrine of marshalling is an equitable doctrine which may be applied by the court for the benefit of a junior lien creditor when the junior lien creditor and senior lien creditor are dealing with a common debtor who owns two or more of the debtors' [sic] properties and the jun-

ior lien creditor has a lien on less of the property than the senior lien creditor.

*Mills,* 40 B.R. at 75, *citing Dixieland Realty, supra.* However, G.S.C. has no standing as a junior lien creditor with respect to the rents from the office building and is not entitled to invoke the equitable doctrine.

G.S.C. had contended both that First Union's Section 364(d) lien did not extend to the Cash Collateral Account and that First Union's pre-prepetition lien in the rents from the office building was unperfected. Neither contention has been accepted. The rents secure both the debtor's pre-petition indebtedness to First Union, and its post-petition indebtedness to First Union under the court-approved Post–Petition Loan Agreement. Therefore, G.S.C. does not qualify as a hypothetical lien creditor, junior or otherwise, under 11 U.S.C. § 544, and the doctrine of marshalling may not be applied.

## VI.

For the reasons set forth herein, First Union's Section 364(d) lien extends to the monies in the Cash Collateral Account; First Union has a perfected and continuing security interest in the pre-petition rents of University Place and, pursuant to Section 552(b), to the post-petition rents contained in the Cash Collateral Account; First Union's motion is not one for payment of an administrative claim, and is not barred as untimely; First Union is entitled to professional fees and expenses in the amount of $58,028.03; and First Union is not required to marshall its security. Accordingly, the $260,000.00 in the Cash Collateral Account shall be applied so that the first $37,978.75 is used to pay the 1990 real estate taxes on the office building, the next $88,444.75 is used to pay the balance of the Post–Petition Loan, the next $58,028.03 is used to pay the professional fees and expenses associated with the Post–Petition Loan, and the final $75,548.47, or so much of that amount as is necessary, is used to pay the

able fees, costs, or charges provided for under

the agreement under which such claim arose.

balance of the pre-petition Loans, with the remainder, if any, to go to the estate.